# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**CHERYL LYNN CAIN-WESA**
          **Plaintiff,**

    **v.**                              **Case No. 11-C-1063**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration**
          **Defendant.**

---

## DECISION AND ORDER

Plaintiff Cheryl Cain-Wesa applied for social security disability benefits, claiming that she could no longer work due to back and neck pain and mental impairments.  (Tr. at 134.)  The Social Security Administration ("SSA") denied her application initially and on reconsideration (Tr. at 71-81), as did an Administrative Law Judge ("ALJ") following a requested hearing (Tr. at 6-17, 82).  The Appeals Council then declined review (Tr. at 1-3), making the ALJ's decision the final word from the agency on plaintiff's application.  See Arnett v. Astrue, 676 F.3d 586, 591 (7th Cir. 2012).  Plaintiff now seeks judicial review of the ALJ's decision.

## I.  APPLICABLE LEGAL STANDARDS

The reviewing court does not decide whether the claimant is disabled.  Powers v. Apfel, 207 F.3d 431 (7th Cir. 2000).  Rather, the court's job is to determine whether the ALJ applied the correct legal standards and supported his decision with "substantial evidence."  Jelinek v. Astrue, 662 F.3d 805, 811 (7th Cir. 2011).  Evidence is "substantial" if a reasonable person could accept it as adequate to support a conclusion.  Skinner v. Astrue, 478 F.3d 836, 841 (7th Cir. 2007).  Thus, if the evidence is such that reasonable minds could differ over whether the

claimant is disabled, the court must affirm the ALJ's decision to deny the claim if adequately supported and explained. Elder v. Astrue, 529 F.3d 408, 413 (7th Cir. 2008). The court may not displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations. Id.

In determining whether the claimant is disabled, the ALJ must follow the sequential five step test set forth in the regulations. See 20 C.F.R. § 404.1520; Craft v. Astrue, 539 F.3d 668, 673 (7th Cir. 2008). The first step considers whether the claimant is working, i.e., engaging in substantial gainful activity ("SGA"). The second step evaluates whether the claimant suffers from a severe, medically determinable physical or mental impairment. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of these Listings, then the claimant is deemed disabled; if the impairment does not meet or equal a Listing, then the evaluation continues. The fourth step assesses the claimant's residual functional capacity ("RFC") and ability to engage in past relevant work. If the claimant can engage in past relevant work, she is not disabled. The fifth step assesses the claimant's RFC, as well as her age, education, and work experience to determine whether she can engage in other work. If the claimant can engage in other work, she is not disabled. Craft, 539 F.3d at 674.

The claimant bears the burden of proof at each of the first four steps. Briscoe v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005). At step five, the burden shifts to the agency to present evidence establishing that the claimant possesses the RFC to perform work that exists in a significant quantity in the national economy. Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011). The agency may meet this burden by calling a vocational expert ("VE") to provide an impartial assessment of the types of occupations in which claimants can work and the

availability of positions in such occupations.  <u>Liskowitz v. Astrue</u>, 559 F.3d 736, 743 (7th Cir. 2009).

## II.  FACTS AND BACKGROUND

**A.     Plaintiff's Application and Supporting Materials**

Plaintiff applied for disability insurance benefits on March 30, 2009, alleging a disability onset date of January 26, 2009.  (Tr. at 134, 171.)  In a disability report, plaintiff indicated that she stood 5'9" tall and weighed 300 pounds.  (Tr. at 174.)  She wrote that she was unable to work due to emotional problems, paranoia, and schizophrenia, which caused her thought processes to be slow, her imagination to overreact, and her sense of reality to be altered; and arthritis, which made it hard for her to reach, sit for long periods, and walk.  (Tr. at 175.)

In a function report, plaintiff indicated that her medication (Abilify) made her thirsty, which in turn caused frequent urination.  (Tr. at 181.)  The medication also caused fatigue.  (Tr. at 182.)  She further wrote that she did not sleep well due to back and neck pain.  Pain medication did not help.  (Tr. at 181.)  Plaintiff stated that she performed daily activities such as washing dishes, using a computer, laundry, cooking, cleaning, and light gardening.  (Tr. at 182, 184.)  She drove a car for some shopping and getting her medication.  (Tr. at 182, 185.)  Her husband cleaned the cats' litter box because it was too hard for her.  (Tr. at 183.)  She needed no reminders to take care of personal needs/grooming or to take medicine.  (Tr. at 184.)  She wrote that she prepared all kinds of meals, although it sometimes took her longer to read and comprehend instructions.  (Tr. at 184.)  She indicated that she was able to pay bills, count change, handle a savings account, and use a checkbook.  (Tr. at 185.)  Her ability to handle money had not changed since her conditions began.  She wrote that she had no

hobbies and rarely socialized.  She indicated that she used to watch TV but now could not sit still for more than ½ hour.  (Tr. at 186.)  She stated that she did not have any problems getting along with family, friends, neighbors, and others.  (Tr. at 187.)  She indicated that she used to be involved with bowling and softball teams but no longer was.  (Tr. at 187.)  Plaintiff further wrote that she experienced pain and stiffness even sitting still.  She could lift five pounds repetitively for exercise, but squatting even once hurt her knees (as did kneeling and climbing stairs).  She also stated that it was hard to breathe when bending.  Standing for ½ hour or more was painful, and she could walk for one block at most.  Reaching was slow and painful.  She could pay attention for ½ hour.  (Tr. at 187.)  She could follow written and spoken instructions "90%" and got along well with authority figures.  (Tr. at 187-88.)  She indicated that she did not handle stress well; she needed to follow a routine.  She sometimes felt paranoid, like people were talking about her.  (Tr. at 188.)  She concluded that while her medication helped keep her emotions under control, the pills had side effects including fatigue.  Her arthritis in the back and neck was also worsening, causing her to feel much older than she was (forty-six).  (Tr. at 189.)

In a physical activities addendum, plaintiff wrote that she moved very slowly and had to be careful not to fall.  She indicated that she stood 5'8" tall and weighed 300 pounds.  She wrote that she slept five hours per night, and that she regularly awoke to drink water and use the bathroom.  She stated that she napped during the day for 1 ½ hours, sitting in a recliner.  She wrote that she could continuously sit 1 ½ hours, stand two hours, and walk ½ hour.  In a day, she could sit fifteen hours, stand seven hours, and walk two hours.  (Tr. at 190.)

In a later disability report completed on November 19, 2009, plaintiff indicated that the arthritis pain in her neck and upper back had worsened since her previous report.  She further indicated that she had recently been diagnosed with high blood pressure.  (Tr. at 211, 218.)

4

She indicated that she took Abilify and Thiothixene for her mental health issues, Celebrex and Cyclobenzaprine for her arthritis and pain, and Triamterene for high blood pressure. (Tr. at 214.) She indicated that her pain and stiffness made it difficult to shower (Tr. at 215), but she reported no change in her other daily activities (Tr. at 216).

## B.   Medical Evidence

### 1.   Treating Sources

On February 12, 2008, plaintiff saw her treating psychiatrist, Dr. Eric Boffeli, for a medication check. Plaintiff reported that she had been doing okay. She had been taking Ambien[1] and found it helpful, especially on a trip to Texas. She felt that her mood disorder had been stable. She reported looking for a new job in electronic assembly, work she had done in the past; she had not had regular employment recently. On mental status exam, she had full range of affect, was fully oriented, with no suicidal thoughts. Dr. Boffeli assessed schizoaffective disorder,[2] with a plan to proceed with Abilify.[3] Plaintiff did not feel she needed the Ambien. She was to return to six months, calling before then if not doing well. (Tr. at 238.)

On May 12, 2008, plaintiff saw Dr. Boffeli for medication check. Plaintiff requested a medication change, as she could not afford the Abilify. She reported having a limited income

---

[1]Ambien is used to treat insomnia. It belongs to a class of medications called sedative-hypnotics. It works by slowing activity in the brain to allow sleep. See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000928/.

[2]Schizoaffective disorder is a mental condition that causes both a loss of contact with r e a l i t y   ( p s y c h o s i s )   a n d   m o o d   p r o b l e m s .   S e e http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001927/.

[3]Abilify (Aripiprazole) is used to treat the symptoms of schizophrenia (a mental illness that causes disturbed or unusual thinking, loss of interest in life, and strong or inappropriate emotions). See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000221/.

and no health insurance. Plaintiff completed the paperwork for the patient assistance program for Geodon,[4] and they discussed beginning with Geodon samples. As he had no samples of Abilify available, Dr. Boffeli indicated that plaintiff would have a rather quick transition. She would for the next week take Abilify 15 mg once per day and Geodon 40 mg for the other dosage. Beginning in one week, she would be taking Geodon only. She would initially be on a lower dose of Geodon and was to call if she was not doing as well. On mental status exam, she had full range of affect, was fully oriented, with no suicidal thoughts. Dr. Boffeli again assessed schizoaffective disorder, with the plan to proceed with the transition to Geodon. She was to return in one month, earlier if not doing well. (Tr. at 237.)

Plaintiff returned to Dr. Boffeli on June 12, 2008, indicating that the Geodon was working well. She initially had lower extremity symptoms (rash with pinkish discoloration) and headache, both of which resolved. She reported that she was sleeping better and was not having mood symptoms. They discussed a cognitive approach to her residual symptoms. On mental status exam, she once again showed full range of affect, full orientation, and no suicidal thoughts. Dr. Boffeli continued her on Geodon. (Tr. at 236.)

On July 29, 2008, plaintiff saw Dr. Joanne Brooks complaining of a possible sinus infection. Dr. Brooks assessed allergic rhinitis and provided Nasacort AQ samples. Dr. Brooks also noted slightly elevated blood pressure, which plaintiff believed related to increased stress over a mistake in taking her Geodon pills. She was to follow up in one or two weeks for a repeat blood pressure check. (Tr. at 235.)

Plaintiff returned to Dr. Brooks on August 11, 2008, continuing to complain of cough and

---

[4]Geodon (Ziprasidone) is used to treat the symptoms of schizophrenia. See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001070/.

6

nasal congestion. She indicated that the cough was a problem of long-standing, which she believed partially related to exposure to smoke at work. She reported that the Nasacort helped somewhat with her nasal congestion. She also complained of fatigue, which had worsened over the past month. She was unsure if these symptoms were related to her recent switch to Geodon. Dr. Brooks assessed allergic rhinitis with chronic cough and fatigue. She prescribed Amoxicillin for a possible underlying sinus infection. If the cough persisted, they would obtain a chest x-ray. (Tr. at 234.) Regarding her fatigue, Dr. Brooks ordered lab work. (Tr. at 232-33, 234.)

Plaintiff saw Dr. Boffeli on August 18, 2008, indicating that the Geodon seemed to be working well for her; she preferred it to Abilify as she found it less sedating. She was pleased with how she was feeling on Geodon and preferred to continue on the same dose. On mental status exam, she appeared relaxed, with no evidence of abnormal muscle movements. She had logical thought processes, insight and judgment were good, and she was oriented x 3. Speech was normal and affect full range. She had no suicidal thoughts. Dr. Boffeli continued her on Geodon, with follow-up in six months. (Tr. at 231.)

On September 3, 2008, plaintiff saw Dr. Thomas Gvora complaining of chest congestion and cough. She reported that the Amoxicillin prescribed by Dr. Brooks had not helped. She also complained of back discomfort, specifically pain in the right low back. She had been using ibuprofen but was looking for something more potent for pain relief. The pain did not radiate into her legs. Examination revealed modest paraspinal lumbar tenderness. Flexion and extension were modestly diminished. Straight leg raising was to about 60 degrees bilaterally, then she had a pulling sensation in the back. Dr. Gvora assessed persistent bronchitis,

prescribing a trial of Zithromax;[5] and a history of back discomfort, for which she was to continue using ibuprofen, heat, and gentle stretching; Dr. Gvora also provided Darvocet[6] for severe pain only.  (Tr. at 230.)

Plaintiff returned to Dr. Boffeli on February 16, 2009, indicating that the Geodon worked in terms of mood stabilization but complaining of a cough since she started taking it.  She also indicated that if she was late for a dose, she felt awful, like she had the flu.  She was interested in switching back to Abilify, and Dr. Boffeli mapped out a transition between the two medications. She reported being presently unemployed.  They discussed a cognitive approach to her residual symptoms.  On mental status exam, she again appeared relaxed, with no abnormal muscle movements, logical thought processes, good insight and judgment, normal speech, and full range affect.  (Tr. at 229.)

Plaintiff next saw Dr. Boffeli on April 27, 2009, doing about the same.  She had not been having paranoia.  She felt the Abilify worked well for her.  She had "applied for Social Security due to inability to work at this point due to her degree of arthritis as well as her mood disorder." On mental status exam, she appeared her usual self.  She had no evidence of abnormal muscle movements, logical thought processes, good insight and judgment, and normal speech. Dr. Boffeli continued her on Abilify, providing samples.  (Tr. at 243, 305.)

On October 5, 2009, plaintiff returned to Dr. Boffeli doing better overall with the Abilify but frustrated by the cost of the medication and the sporadic availability of samples.  They

---

[5]Zithromax is used to treat certain infections caused by bacteria, such as bronchitis.  See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001009/.

[6]Darvocet contains a combination of propoxyphene and acetaminophen.  It is used to relieve mild to moderate pain with or without fever.  See http://www.drugs.com/darvocet.html.

discussed the possibility of Thiothixene, which she had used in the past, as well as Lithium. She preferred to switch back to Thiothixene if the Abilify was not available. Dr. Boffeli noted that plaintiff had a pending decision regarding social security, stating: "She does have difficulty maintaining work beyond temporary positions and has difficulty functioning even in temporary positions due to her degree of arthritis, as well as her mood disorder." (Tr. at 304.) On mental status exam, she again "appeared to be her usual self." (Tr. at 304.) She had no evidence of abnormal muscle movements, logical thought processes, good insight and judgment, and normal speech, with no suicidal thoughts. Dr. Boffeli planned to proceed with Abilify. (Tr. at 304.)

Plaintiff saw Dr. Brooks on October 26, 2009, noting that she recently had her blood pressure checked at her job,[7] and it was high. She denied any headache or dizziness, or extremity numbness or tingling. She also complained of difficulty sleeping, waking up several times per night with dry mouth, and concerned about possible diabetes. She also noted a weight gain of thirty pounds in one year. She further complained of difficulty with fatigue. Finally, she complained of continued cough and nasal congestion. On exam, her blood pressure was 154/100 and her weight 323 pounds. Dr. Brooks diagnosed hypertension, starting plaintiff on Maxzide[8] and ordering various tests; allergic rhinitis, providing samples of Omnaris;[9] sleep disturbance, awaiting a thyroid study and considering a sleep study; and hot

---

[7]Plaintiff reported working for General Electric ("GE") in electronic assembly. (Tr. at 302.)

[8]Maxzide is a combination of triamterene and hydrochlorothiazide, used to treat high blood pressure and edema. See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000110/.

[9]Omnaris is a nasal spray used to treat the symptoms of allergic rhinitis. See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000359/.

flashes, likely perimenopausal.  (Tr. at 302.)

Plaintiff returned to Dr. Brooks on November 2, 2009, complaining primarily of back pain. She reported a history of back and neck pain, and denied any recent trauma.  She reported that her symptoms had recently worsened, for which she had been taking ibuprofen and Tylenol.  She reported previous use of Darvocet, without relief.  She denied any upper extremity numbness or tingling, but the pain was worse with movement.  On exam, she was tender to palpation over the vertebral cervical spine, as well as the mid-thoracic spine.  She did have full range of motion but experienced pain with rotation.  Dr. Brooks assessed mid back and neck pain, with a history of cervical degeneration, providing samples of Celebrex[10] and ordering x-rays.  (Tr. at 298.)  X-rays of the cervical and thoracic spine taken on November 3, 2009, showed degenerative changes in the lower cervical spine with disc space narrowing at C5-C6, and multi-level degenerative changes in the thoracic spine with no acute osseous abnormality.  (Tr. at 297.)

Plaintiff returned to Dr. Brooks on November 10, 2009, complaining chiefly of neck pain. The Celebrex did not provide full relief.  She also complained of continued nasal congestion, with no relief from the Omnaris.  On exam, she had full range of motion of the neck, and she was non-tender to palpation of the vertebral spine.  Dr. Brooks assessed mid back pain and allergic rhinitis, continuing plaintiff on Celebrex and adding Tylenol to assist with pain, as well

---

[10]Celebrex is used to relieve pain, tenderness, swelling and stiffness caused by osteoarthritis (arthritis caused by a breakdown of the lining of the joints), rheumatoid arthritis (arthritis caused by swelling of the lining of the joints), and ankylosing spondylitis (arthritis that mainly affects the spine).  See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001050/.

as giving her a prescription for Cyclobenzaprine.[11]  Regarding her nasal congestion, Dr. Brooks asked her to do a Neti pot over the counter to see if this might provide relief.  If this did not help, they would consider sinus x-rays.  (Tr. at 295.)

On February 8, 2010, plaintiff saw Dr. Boffeli, feeling that the transition to Thiothixene had been favorable.  She noticed that if she did not take 1 mg of Abilify in the morning she did not feel as well.  She felt that the Abilify increased her wellness and gave her some energy. They discussed her using the Abilify 1 mg as needed, with Thiothixene 2 mg in the morning and 4 mg in the evening.  She was not working at the time, and Dr. Boffeli stated: "Due to her mood disorder she has been unable to function in a competitive work environment."  (Tr. at 294.)  On mental status exam, Dr. Boffeli again noted that plaintiff appeared her usual self, with no evidence of abnormal muscle movements, logical thought processes, good insight and judgment, and normal speech, with no suicidal thoughts.  (Tr. at 294.)

Plaintiff next saw Dr. Boffeli on August 16, 2010, doing well on Thiothixene, tolerating it without side effects.  She again appeared her usual self; she had no evidence of abnormal muscle movements, no suicidal thoughts, and normal speech.  Dr. Boffeli continued her medications and scheduled a re-check in six months.  (Tr at 293.)

On October 25, 2010, Dr. Boffeli prepared a report, indicating that he had treated plaintiff since August 22, 1994, seeing her between monthly and every six months (limited by lack of insurance).  He diagnosed schizoaffective disorder, with a current GAF of 39, highest

---

[11]Cyclobenzaprine, a muscle relaxant, is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries.  See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000699/.

in the past year 42.[12]  As signs and symptoms, he listed poor memory, appetite disturbance

with weight gain, sleep disturbance, personality change, mood disturbance, emotional lability,

delusions or hallucinations, oddities of thought, catatonia or grossly disorganized behavior,

social withdrawal or isolation, blunt or inappropriate affect, illogical thinking, decreased energy,

anhedonia, psychomotor agitation or retardation, paranoia, difficulty thinking or concentrating,

generalized persistent anxiety, and hostility or irritability.  (Tr. at 308-09.)  He indicated that she

had, on exam, evidence of psychotic thinking and paranoia.   He indicated that she had

symptoms since 1992.  (Tr. at 309.)  He stated that she took Navane (i.e., Thiothixene), which

caused no side effects.  As a prognosis, he indicated that she was likely to have ongoing

symptoms due to the severity and chronic nature of her condition.  (Tr. at 310.)  He indicated

that she would likely be absent more than three times per month due to her impairments.  He

further indicated that she had poor or no ability to maintain attention for a two hour segment,

maintain regular attendance, sustain an ordinary routine without special supervision, work in

coordination with or proximity to others, complete a normal workday without interruptions from

psychologically based symptoms, perform at a consistent pace without unreasonable breaks,

accept instruction and respond appropriately to criticism from supervisors, get along with co-

workers, respond appropriately to change in a routine work setting, and deal with normal work

---

[12]"GAF" – the acronym for "Global Assessment of Functioning" – rates a person's psychological, social, and occupational functioning. Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting herself or others.  Scores of 81-90 reflect "absent or minimal" symptoms, 71-80 "transient" symptoms, 61-70 "mild" symptoms, 51-60 "moderate" symptoms, 41-50 "severe" symptoms, 31-40 some impairment in reality testing, 21-30 behavior considerably influenced by delusions or hallucinations, and 11-20 some danger of hurting self or others. Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000).

stress. (Tr. at 311.) He wrote that her concentration and ability to handle stress were impaired by her mood disorder. He further indicated that she had poor or no ability to interact appropriately with the general public, maintain socially appropriate behavior, travel in unfamiliar places, and use public transportation. He wrote: "Evidence of interpersonal difficulties noted in office setting." (Tr. at 312.) Finally, he found marked restriction of activities of daily living; extreme difficulty in social functioning; constant deficiencies of concentration, persistence, and pace; and continual episodes of decompensation. (Tr. at 312-13.)

On February 21, 2011, plaintiff saw Dr. Boffeli for medication check. Dr. Boffeli noted that her social security case was still pending, stating: "She is not able to work in a competitive work environment. She has done her best to try various jobs, but invariably lost the job. She is not able to work at present." (Tr. at 292.) On mental status exam, Dr. Boffeli once again found that plaintiff "appeared to be her usual self. She had no evidence of abnormal muscle movements. She had no suicidal thoughts or thought processes. Speech was normal." (Tr. at 292.) Dr. Boffeli proceeded with Thiothixene, which plaintiff preferred due to the expense of other medications. (Tr at 292.)

### 2. SSA Consultants

On May 26, 2009, Dr. Michael Baumblatt prepared a physical RFC assessment report for the state Disability Determination Services, finding plaintiff capable of sedentary work, with no additional limitations. (Tr. at 246-53.) In his comments, Dr. Baumblatt indicated that plaintiff was obese and experienced chronic back pain. However, the pain was not radiating and flexion/extension were only mildly diminished. Neurological exam was normal. According to her function reports, plaintiff could perform housework, prepare meals, and had no difficulty with personal care. She stated that she could walk only one block, which may not be

unreasonable considering her obesity (309 pounds). Her allegations were considered fully credible, and she was found capable of sedentary work. (Tr. at 253.)

On June 2, 2009, an unidentified consultant completed a psychiatric review technique form ("PRTF"), indicating that plaintiff had no severe mental impairment. (Tr. at 254-67.) The report evaluated plaintiff under Listing 12.04, Affective Disorders, based on her diagnosis of schizoaffective disorder (Tr. at 254, 257), finding no restriction of activities of daily living; mild difficulty in social functioning; no difficulty in concentration, persistence, and pace; and no episodes of decompensation (Tr. at 264). The consultant's notes indicated that plaintiff appeared asymptomatic on medications and mental status exams were essentially normal. Her function report indicated that she did not spend time with others but otherwise contained no mention of psychological limitations. Her allegations were considered fully credible, but the impairment was non-severe. (Tr. at 266.)

On August 13, 2009, Dr. Pat Chan completed a physical RFC assessment report, finding plaintiff capable of light work with no additional limitations. (Tr. at 270-77.) Dr. Chan noted that plaintiff reported the ability to sit fifteen hours, stand seven hours, and walk two hours during a day. She also reported the ability to perform various household chores. Dr. Chan expected plaintiff to have limitations due to morbid obesity but still be able to do light work. (Tr. at 275.)

On August 17, 2009, Jack Spear, Ph.D., completed a PRTF finding no severe mental impairment. (Tr. at 278-91.) Dr. Spear also evaluated plaintiff under Listing 12.04, finding mild restriction of activities of daily living; mild difficulty in social functioning; mild difficulty in concentration, persistence, and pace; and no episodes of decompensation (Tr. at 288). Dr. Spear noted that plaintiff appeared asymptomatic on medication, her mood was stable, her affect full range, thought processes and speech normal, insight and judgment good, with no

14

suicidal ideation.  Regarding her activities of daily living, she reported preparing complete meals, doing household chores, light gardening, driving, shopping, and handling finances.  She did not socialize but reported no problems getting along with others.  Nor did she report problems with memory or concentration.  (Tr. at 290.)

## C.    Hearing Testimony

On April 14, 2011, plaintiff appeared with counsel before ALJ Eric Borda.  (Tr. at 33.) At the outset of the hearing, counsel amended the onset date to January 1, 2010, based on a period of employment at the end of 2009.  (Tr. at 38.)

### 1.    Plaintiff

Plaintiff testified that she had an associate's degree in business and computer programming.  She indicated that she last worked in 2009 performing medical assembly work for GE.  (Tr. at 40.)  This work required her to lift up to twenty-five pounds and was performed ½ standing and ½ at a desk.  (Tr. at 40-41.)  She testified to having some trouble with her upper back and neck in this job, and that she left early some days to see a doctor.  (Tr. at 41, 52.)  Before that, she worked at Target but had trouble handling her duties as a cashier, "pushing buttons and learning what – which category to press on these new registers."  (Tr. at 42.)  She testified that her problems stemmed from a combination of physical limitations and understanding/comprehending the routine.  (Tr. at 42-43.)  Prior to that, she testified that she worked in factories doing assembly of electronic parts and inspecting canisters.  (Tr. at 43.) She testified that she could no longer do this kind of work due to the stress of being on her feet all day.  (Tr. at 43-44.)  She also testified to trouble sleeping due to tingling in her arms because of her arthritis.  (Tr. at 44.)  She further testified that she would have trouble satisfying

15

a manager or co-workers, and understanding instructions due to short-term memory problems. When asked why she could not work full-time, plaintiff pointed to a combination of physical and mental problems, including the stress of trying to do a good job.  (Tr. at 45.)

Plaintiff testified that she experienced pain in the upper back and neck, which caused limited motion and stiffness.  She obtained some relief by taking a hot shower or using acetaminophen.  (Tr. at 46.)  She further testified that she suffered from depression, schizoaffective disorder, and paranoia, which caused her imagination to get out of control, believing that others were talking about her, and breaking her concentration on her work.  (Tr. at 46-47.)  She indicated that she used to get along with co-workers, but in the past five years or so she easily became upset and emotional.  (Tr. at 47.)  She testified that she received treatment from a psychiatrist, who prescribed medication, which helped to a certain point.  (Tr. at 48.)  However, the medication caused side effects of fatigue, lightheadedness, thirst, and frequent urination.  (Tr. at 50.)  She testified that she did not receive treatment for her back and took only over-the-counter pain medication.  (Tr. at 49.)  Plaintiff stated that she was able to bathe and dress herself but did so pretty slowly.  She also indicated that she was able to cook and clean, but also did that on her own slow pace.  (Tr. at 49.)

Plaintiff testified that she had been seeing Dr. Boffeli since 1994, and that he had frequently adjusted her medications over that time.  (Tr. at 51.)  She indicated that she tried to work in 2010, in a laundry and a plastics factory, but was unable to handle the work.  (Tr. at 53-54.)  She testified that her last full-time job was as a school bus driver in 2001.  (Tr. at 54-55.)  She indicated that she was terminated from that job due to trouble with her supervisor.  (Tr. at 55.)  Since then, she worked for temporary agencies, never being retained permanently.  (Tr. at 55-56.)  She indicated that she lost assignments due to poor performance and absenteeism.

(Tr. at 56.)

Plaintiff testified that she had gained weight over the past five years, which was one of the side effects of her medication. She also testified that her pain affected her ability to concentrate. (Tr. at 57.) She further testified to trouble sleeping due to tingling in her arms and need to use the bathroom every hour and a half. On a good night, she got a total of about five hours of sleep. (Tr. at 58.) Plaintiff testified that she rarely went out due to financial constraints. (Tr. at 58-59.)

Plaintiff testified that she drove about once per week. Her husband usually accompanied her food shopping, to help with decision-making and loading/unloading the cart. (Tr. at 59.) He also helped with the laundry. She testified that she experienced good days and bad days. On a bad day, which happened about three times per month, she stayed in bed all day. She testified to having few friends. (Tr. at 60.)

### 2. Vocational Expert

The vocational expert ("VE"), Juletta Heron, classified plaintiff's past relevant work as a school bus driver as medium, semi-skilled; electronic assembler as light or sedentary, unskilled; and medical products assembler as light or sedentary, unskilled. (Tr. at 61-64.) The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and work experience, able to perform the full range of sedentary work. Such a person could not perform plaintiff's past work as she performed it, but could perform other jobs in assembling, inspecting, and packaging of small parts. (Tr. at 64.)

For his second hypothetical, the ALJ added restrictions to simple, routine, repetitive tasks in a work environment free of fast-paced production requirements, involving only simple work-related decisions with few, if any, workplace changes; this person would further be off-

17

task 5% of the time due to impaired attention and concentration; could have no interaction with the public; and only occasional interaction with co-workers, with no tandem tasks. (Tr. at 65.) The VE testified that such a person could perform the same occupations previously identified, but with 50% of those jobs eliminated. (Tr. at 65-66.)

For his third hypothetical, the ALJ assumed a person of plaintiff's age, education, and work experience, able to do sedentary work, limited to one or two step tasks; off-task 10% of the day due to moderately impaired attention and concentration; working in a low stress job, defined as having no fixed production quotas; no hazardous conditions; only occasional decision making required; only occasional changes in the work setting; no production rate or pace work; no interaction with the public; and occasional interaction with co-workers, with no tandem tasks. (Tr. at 66.) The VE testified that she did not believe there would be substantial work for such an individual. (Tr. at 67.) If the person would be absent at least three days per month, competitive employment would also be precluded. (Tr. at 67.)

**D.    ALJ's Decision**

On May 5, 2011, the ALJ issued an unfavorable decision. (Tr. at 6.) Following the sequential evaluation process, the ALJ first determined that plaintiff had not engaged in SGA since January 1, 2010, the amended alleged onset date. Second, the ALJ found that plaintiff suffered from the severe impairments of chronic upper back pain, obesity, and schizoaffective disorder. (Tr. at 11.) At step three, the ALJ found that none of these impairments met or medically equaled a Listing. (Tr. at 11-12.) At step four, the ALJ found that plaintiff retained the RFC to perform sedentary work involving only simple, routine, and repetitive tasks; in a work environment free of fast paced production requirements; involving only simple work related decisions with few, if any, work place changes; allowing plaintiff to be off task 5% of the

18

day due to impaired concentration and attention, in addition to regularly scheduled breaks; no interaction with the public; only occasional interaction with co-workers and no tandem tasks; and only occasional "over the shoulder" supervision. (Tr. at 12-13.) In making this determination, the ALJ considered plaintiff's testimony and statements but found her claims of more severe mental and physical limitations unsubstantiated by the medical and other evidence of record. (Tr. at 14-15.) The ALJ also considered Dr. Boffeli's October 25, 2010 report, but gave it "little weight." (Tr. at 15.) Instead, he gave "great weight" to the state agency physical RFC assessments and "some weight" to the state agency psychological consultants. (Tr. at 16.)

Based on this RFC, the ALJ found that plaintiff could not return to her past work as a school bus driver, assembler of electrical products, and medical products assembler. (Tr. at 16.) However, relying on the VE's testimony, the ALJ concluded at step five that plaintiff could perform other jobs such as assembler, inspector, and packager. (Tr. at 16-17.) Accordingly, he found plaintiff not disabled. (Tr. at 17.)

## III. DISCUSSION

Plaintiff argues that the ALJ erred in (1) assessing the credibility of her statements, (2) evaluating the treating source report from Dr. Boffeli, (3) considering the Listings, and (4) formulating the RFC. I address each argument in turn.

### A. Credibility

In assessing the credibility of a social security claimant's statements, the ALJ must follow a two-step process. The ALJ first determines whether the claimant suffers from some medically determinable impairment that could reasonably be expected to produce her claimed

symptoms and limitations.  SSR 96-7p.  If the claimant suffers from no such impairment(s), or if her impairment(s) could not reasonably be expected to produce the alleged symptoms, the symptoms cannot be found to affect her ability to work.  SSR 96-7p.  Second, if the ALJ finds that the claimant's impairment(s) could produce the symptoms alleged, he must then determine the extent to which those symptoms limit the claimant's ability to work.  SSR 96-7p.  In making this determination, the ALJ may not discount the claimant's statements just because they are not supported by the objective medical evidence.  Moss v. Astrue, 555 F.3d 556, 561 (7th Cir. 2009).  Rather, the ALJ must consider the entire record, including, in addition to the medical evidence, the claimant's daily activities; the frequency and intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes; treatment, other than medication, for relief of symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  SSR 96-7p.  The ALJ must then provide "specific reasons" for the credibility determination, supported by the evidence and articulated in the decision.  SSR 96-7p.  The court reviews an ALJ's credibility determination deferentially, reversing only if it is "patently wrong."  Schaaf v. Astrue, 602 F.3d 869, 875 (7th Cir. 2010).

In the present case, the ALJ started his credibility assessment with "meaningless boilerplate seen frequently in decisions from ALJs," Shauger v. Astrue, 675 F.3d 690, 696 (7th Cir. 2012) (citing Bjornson v. Astrue, 671 F.3d 640, 644-45 (7th Cir. 2012); Parker v. Astrue, 597 F.3d 920, 921-22 (7th Cir. 2010)), stating:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity evaluation.

(Tr. at 14.)  As the Seventh Circuit has explained, this language – a "template" drafted by the SSA for insertion into any ALJ's opinion to which it pertains – gives the reviewing court no clue as to which statements are deemed credible and which are not, and why.  Bjornson, 671 F.3d at 645.  Worse, it "backwardly 'implies that the ability to work is determined first and is then used to determine the claimant's credibility.'"  Shauger, 675 F.3d at 696 (quoting Bjornson, 671 F.3d at 645).

However, use of the template does not mandate reversal in every case.  See, e.g., Ison v. Astrue, No. 10 C 0711, 2012 WL 832983, at *8 (N.D. Ill. Mar. 12, 2012 (citing Richison v. Astrue, No. 11-2274, 2012 WL 377674, at *3 (7th Cir. Feb. 7, 2012); Carter v. Astrue, 413 Fed. Appx. 899, 905-906 (7th Cir. 2011)); Pfund v. Astrue, No. 10-C-1145, 2011 WL 3844155, at *14 (E.D. Wis. Aug. 26, 2011) (citing Hadley v. Astrue, No. 10-C-119, 2010 WL 3386587, at *18 n.18 (E.D. Wis. Aug. 26, 2010)).  If the ALJ continued on with the credibility analysis, providing specific reasons for his finding, the court may nevertheless affirm.  In the present case, immediately after the above-quoted boilerplate, the ALJ provided several specific reasons for finding plaintiff's claimed limitations exaggerated.

First, the ALJ stated that while plaintiff alleged disability due to back problems which significantly limited her ability to sit, stand, and walk, the alleged severity of her pain and functional limitations was not substantiated by the evidence of record.  (Tr. at 14.)  In making this determination, the ALJ found that plaintiff's reports of pain appeared out of proportion to the medical evidence.  The ALJ noted the absence of any recent objective medical testing for her back impairment and the minimal findings on physical examinations.  For instance, x-rays from 2007 showed some degenerative changes but no acute osseous abnormality.  Further, plaintiff sought treatment for her physical impairments only sporadically.  (Tr. at 14.)  In

September of 2008, plaintiff complained of back pain and was treated with ibuprofen, heat, exercises, and Darvocet as needed. (Tr. at 13, 230.) Examination at that time revealed only modest lumbar tenderness and modestly diminished flexion and extension. (Tr. at 230.) Plaintiff sought no further treatment for back pain for over a year; in October 2009, she underwent a thorough physical exam, reporting no problems with her back. (Tr. at 13, 302.) On November 2, 2009, plaintiff complained of mid-back pain that radiated into her neck. On exam, she had some tenderness to palpation, but range of motion was full. (Tr. at 13, 298.) Dr. Brooks provided samples of Celebrex and ordered x-rays (Tr. at 13, 298), which revealed no fracture, dislocation, or acute osseous abnormality (Tr. at 297). When plaintiff returned to Dr. Brooks on November 10, 2009, she complained of neck pain, but on exam of the neck she had full range of motion, and exam of the back revealed no erythema or swelling with no tenderness to palpation of the vertebral spine. (Tr. at 13, 295.) She was continued on Celebrex, advised to add over-the-counter Tylenol, and prescribed Cyclobenzaprine, a muscle relaxant. (Tr. at 13, 295.) The record contains no further evidence of treatment for back or neck pain. While subjective reports of pain may not be rejected based <u>solely</u> on a lack of support in the objective medical evidence, the ALJ may reasonably consider such limited treatment, or discrepancies between the objective evidence and self-reports, in finding claimed symptoms and limitations exaggerated. <u>E.g.</u>, <u>Simila v. Astrue</u>, 573 F.3d 503, 519 (7th Cir. 2009); <u>Getch v. Astrue</u>, 539 F.3d 473 (7th Cir. 2008).

Second, while the ALJ accepted that plaintiff's physical impairments, including her obesity, affected her ability to stand and walk for long periods, he noted the absence of evidence that they affected her ability to perform a sit-down job. (Tr. at 14.) The ALJ specifically noted that plaintiff reported that during a regular day she was able to sit fifteen

22

hours, and that she lifted five pounds repetitively for exercise. (Tr. at 14-15.) An ALJ may rely on such admissions in rejecting a claimant's contention that she cannot perform even sedentary work. See Knight v. Chater, 55 F.3d 309, 314-15 (7th Cir. 1995).

Third, while accepting that plaintiff suffered from a severe mental impairment, the ALJ found the alleged severity of her psychological symptoms and functional limitations unsubstantiated by the record. (Tr. at 15.) For example, the ALJ noted that on repeated mental status examinations plaintiff displayed no evidence of abnormal muscle movements, her thought processes were logical, her insight and judgment were good, her speech was normal, and she had no suicidal thoughts. (Tr. at 15; see, e.g., Tr. at 229, 243, 292, 293, 294, 304.) The ALJ further noted that plaintiff had been maintained on medication, and on several occasions she reported improvement in her condition or good results with treatment. (Tr. at 15; see, e.g., Tr. at 229, 231, 236.) She also admitted at the hearing that her medications controlled her schizoaffective disorder. (Tr. at 15.) The ALJ may find symptoms non-disabling when the record suggests that they are largely controlled with proper medication and treatment. See, e.g., Skinner, 478 F.3d at 845.

Finally, the ALJ noted that in spite of her combined impairments, plaintiff had remained fairly active. For example, she was able to prepare meals, do housework, wash dishes, do laundry, use a computer, drive, shop, garden, and care for her personal needs. (Tr. at 15.) Accordingly, the ALJ rejected as inconsistent with the record plaintiff's contention that she would be absent from work three or more days per month. (Tr. at 15.) While the Seventh Circuit has cautioned against placing undue weight on a claimant's activities of daily living, some weight is appropriate, Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006), particularly where the claimant's own disclosure of her activities suggests a greater capacity than otherwise

23

claimed, see, e.g., Arnold v. Barnhart, 473 F.3d 816, 823 (7th Cir. 2007).

The ALJ concluded:

> In summary, I have considered the claimant's description of her physical and mental limitations and subjective complaints and find that, although the claimant's impairments are considered to be severe, for the most part the evidence of record does not support the level of limitation described by the claimant and shows that she has remained fairly active. Accordingly, I find that the claimant remains capable of performing sedentary work involving simple, routine and repetitive tasks in a work environment free of fast paced production requirements; involving only simple, work related decisions; with few, if any, work place changes; due to moderately impaired attention and concentration work off task 5% of [the] day in addition to regularly scheduled breaks; with no interaction with the public; only occasional interaction with coworkers with no tandem tasks; and, only occasional "over the shoulder" supervision.

(Tr. at 15-16.) Thus, while the boilerplate template got things backwards, in the narrative portion of his decision the ALJ first evaluated credibility and then set RFC. In other words, the instant decision would read just fine with the boilerplate excised.[13]

Plaintiff argues that her statements fell on deaf ears and had no apparent impact on the RFC determination. I disagree. As discussed above, the ALJ considered plaintiff's claimed physical and mental limitations – and credited them to some extent – but found them exaggerated to the extent she claimed inability to perform even low stress, sit-down work. See Johnson v. Barnhart, 449 F.3d 804, 805 (7th Cir. 2006) (noting that the ALJ is not obliged to believe all of the claimant's testimony and may discount it based on the other evidence in the case). Plaintiff lists various statements that the ALJ did not specifically consider, but the ALJ is not required to evaluate in writing every piece of testimony and evidence submitted; the ALJ need only sufficiently articulate his assessment of the evidence to assure the reviewing court that he considered the important evidence and to enable the court to trace the path of his

_____

[13]The ALJ would be well advised to delete/omit the template from future decisions.

reasoning.  Books v. Chater, 91 F.3d 972, 980 (7th Cir. 1996) (citing Carlson v. Shalala, 999 F.2d 180, 181 (7th Cir. 1993)).

Plaintiff notes that the ALJ did not specifically discuss her difficulty working at GE for three months in 2009.  However, that job required plaintiff to lift twenty to thirty pounds and be on her feet half the day (i.e., light work), while the ALJ limited plaintiff to sedentary work and found her unable to return to past employment.  Thus, the ALJ's failure to specifically discuss plaintiff's problems at GE was, at most, harmless error.  Plaintiff also complains that the ALJ failed to discuss her failed attempt to work a cash register at Target due to nervousness and trouble understanding what she was expected to do; her inability to work at a plastics factory because she could not keep pace with the machine; and her inability to work fast enough soldering wire harnesses for electronic assembly.  But the ALJ accounted for these problems by limiting plaintiff to simple, routine, and repetitive tasks in a work environment free of fast paced production requirements; involving only simple work related decisions with few, if any, work place changes; only occasional interaction with coworkers with no tandem tasks and only occasional "over the shoulder" supervision; and no interaction with the public.[14]  Plaintiff further notes her testimony that she did not think she would be able to perform her former job inspecting propane canisters, but, again, the ALJ agreed that plaintiff could not return to past work.

Finally, plaintiff argues that the ALJ failed to consider her good and bad days.  However,

---

[14]These restrictions also addressed plaintiff's more general testimony and statements about work stress, issues with managers and co-workers, and trouble understanding instructions.  Plaintiff testified that she tried many times to get full-time work from beginning in a temporary job, but it never panned out.  However, inability to land a full-time job does not mean the person is disabled under social security law.  See 20 C.F.R. § 404.1566(c).

the ALJ specifically rejected as "inconsistent with the medical and other evidence of record" plaintiff's contention that she would be absent more than three days per month due to her impairments.  (Tr. at 15.)  Plaintiff contends that the ALJ failed to state which evidence he relied upon in making this finding, but the ALJ preceded this statement with a list of plaintiff's daily activities, which the ALJ could reasonably conclude cut against plaintiff's claim of disability.  See, e.g., Johansen v. Barnhart, 314 F.3d 283, 288 (7th Cir. 2002) ("Johansen is right that involvement in 'minimal' daily activities does not necessarily contradict a claim of disability.  Here, however, we doubt whether Johansen's daily activities (e.g., performing his home exercise and traction program, grocery shopping, doing laundry, driving a car, and walking one mile daily) qualify as truly 'minimal.'") (internal citation omitted); Scott v. Sullivan, 898 F.2d 519, 524 n.6 (7th Cir. 1990) (finding that the claimant's testimony that he could help out around the house, carry groceries, set the table, ride a bike, and go hunting and fishing supported the ALJ's conclusion that the claimant was not limited to sedentary work).

In sum, I find that the ALJ adequately considered the evidence and provided sufficiently specific reasons in determining credibility.  His conclusion was not patently wrong.  Accordingly, I reject plaintiff's first claim of error.[15]

---

[15]In her reply brief, plaintiff argues that the ALJ failed to evaluate the seven enumerated factors in SSR 96-7p.  However, the ALJ need not discuss all of these factors in checklist fashion.  See Lechner v. Barnhart, 321 F. Supp. 2d 1015, 1030 (E.D. Wis. 2004) (citing Clay v. Apfel, 64 F. Supp. 2d 774, 781 (N.D. Ill. 1999)).  Plaintiff also argues that the ALJ failed to specifically address the type, dosage, effectiveness, and side effects of the medications she used.  But the ALJ did discuss plaintiff's medications for both physical (Tr. at 13) and mental (Tr. at 14) impairments.  Regarding her psychiatric medications, the ALJ specifically noted: "On a number of occasions since February 2008, the claimant has reported that her medications were helpful, that they were working well for her, that her symptoms had improved, and that her impairment was stable."  (Tr. at 14.)  The ALJ discussed Dr. Boffeli's treatment notes, in which plaintiff reported on February 8, 2010 that "her transition to thiothixene had been favorable, and also that the Abilify increased her wellness and gave her some energy. . . . On

## B.    Treating Source Report

The ALJ must give "controlling weight" to the opinion of a social security claimant's treating physician if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence.  Punzio v. Astrue, 630 F.3d 704, 710 (7th Cir. 2011).  The ALJ must provide "good reasons" for declining to adopt a treating source report.  Campbell v. Astrue, 627 F.3d 299, 306 (7th Cir. 2010).  If the report does not meet the test for controlling weight, the ALJ must decide what weight the opinion does deserve, considering the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency with and support for the physician's opinion in the record.  Id. at 308; see also Bauer v. Astrue, 532 F.3d 606, 608 (7th Cir. 2008) (stating that when the treating physician's opinion is not given controlling weight this "checklist" of factors comes into play); 20 C.F.R. § 404.1527 (setting forth the factors for evaluating medical source opinions).

In the present case, the ALJ stated:

> I have also considered the Mental Impairment Questionnaire dated October 25, 2010, from Dr. Boffeli, the claimant's treating psychiatrist since 1994.  Dr. Boffeli opined that the claimant's schizoaffective disorder caused her significant functional limitations, including fair to poor or no abilities in all areas needed to

_____

follow up on August 16, 2010, the claimant reported that she had been doing well on thiothixene, and that she was tolerating it without side effects."  (Tr. at 14.)  Based on this evidence, it was not unreasonable for the ALJ to conclude that plaintiff had "been maintained on medication," got "good results with treatment," and "that her medications control her schizoaffective disorder."   (Tr. at 15.)  Plaintiff also argues in reply that the ALJ failed to recognize the difference between limited activities at home and the demands of full time work. However, the ALJ could reasonably conclude that plaintiff's activities were not truly limited. See Johansen, 314 F.3d at 288.  "In any event[,] even assuming that [plaintiff's] activities can be characterized as [limited], the ALJ's decision adequately explained how [her] allegation that [she] could not perform [sedentary] work was inconsistent with the record viewed as a whole." Id.

do work, and that her impairment was so severe that it would meet a listing with marked limitations in activities of daily living, extreme difficulties in social functioning, and constant deficiencies in concentration, persistence, pace. He also indicated that she would be absent more than three times per month due to her mental impairment. However, I give little weight to Dr. Boffeli's opinion regarding the claimant's functional limitations. Specifically, Dr. Boffeli noted none of these symptoms in his treatment records. For example, in the questionnaire he stated that there was "evidence of interpersonal difficulty in office setting," yet this was not reflected in the treatment notes. He consistently found no evidence of any abnormalities on mental status examinations and his notes reflected that her condition was well controlled with medications. In addition, although it was noted in his record a few times that the claimant could not work, it was always indicated that this was something stated by the claimant and there is no indication that he ever assigned her any type of work restrictions prior to completing this questionnaire.

(Tr. at 15, internal record citations omitted.) As discussed above, the ALJ also noted plaintiff's extensive daily activities in rejecting as inconsistent with the medical and other evidence of record the contention that she would be absent from work three or more days per month. (Tr. at 15.) Finally, in making his RFC determination, the ALJ gave "great weight" to the state agency physical RFC assessments, which found plaintiff capable of sedentary and light work (with no further limitations), and "some weight" to the state agency psychological consultants, who found no severe mental impairment. (Tr. at 16.)

These are "good reasons." An ALJ may reject a treating source's opinion when it conflicts with his own treatment notes. E.g., Richison, 2012 WL 377674, at *2; Turner v. Astrue, 390 Fed. Appx. 581, 587 (7th Cir. 2010); Schmidt v. Astrue, 496 F.3d 833, 842 (7th Cir. 2007). Likewise, the ALJ can discount a report based on the claimant's subjective complaints. E.g., Ketelboeter v. Astrue, 550 F.3d 620, 625 (7th Cir. 2008); see also Rice v. Barnhart, 384 F.3d 363, 371 (7th Cir. 2004) ("[M]edical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints."). And, the ALJ need not defer to conclusory statements that the

28

claimant is "disabled" or "cannot work." <u>See, e.g.</u>, <u>Richison</u>, 2012 WL 377674, at *2; <u>see also</u> <u>Johansen</u>, 314 F.3d at 289.

Plaintiff argues that the ALJ failed to evaluate certain discrete opinions within Dr. Boffeli's treating source report. But the ALJ summarized the key provisions of the report; he did not have to address every word. Plaintiff also argues that the ALJ erred in rejecting the report as inconsistent with the treatment notes, skipping the other factors in the checklist. I disagree. The ALJ noted that Dr. Boffeli, plaintiff's treating psychiatrist since 1994, periodically saw her for medication management. He noted the results of Dr. Boffeli's mental status examinations and evaluation of the effectiveness of the prescribed medication. And he discussed the lack of support and inconsistency with the record evidence, including the treatment notes, plaintiff's reported daily activities, and the opinions of the state agency psychological consultants.[16]

Plaintiff takes issue with the ALJ's finding that Dr. Boffeli relied on plaintiff's statements that she could not work. However, this was not an unreasonable inference from Dr. Boffeli's treatment notes. (Tr. at 292, 304.) Specifically, in his February 21, 2011 note, Dr. Boffeli appeared to draw the conclusion that plaintiff "is not able to work in a competitive work environment" from plaintiff's reports that she "has done her best to try various jobs, but unvariably lost the job." (Tr. at 292.) As indicated above, a claimant's inability to find and maintain a job does not make her disabled under SSA rules. In any event, as also discussed above, the ALJ need not give special consideration to a bald statement that the claimant is

---

[16]As plaintiff notes in reply, the contrary report of a non-examining consultant will not alone suffice to reject a treating source opinion. <u>See, e.g.</u>, <u>Gudgel v. Barnhart</u>, 345 F.3d 467, 470 (7th Cir. 2003). In the present case, as indicated in the text, the ALJ also relied on other factors in giving Dr. Boffeli's report little weight.

"disabled" or "unable to function in a competitive work environment." <u>See</u> 20 C.F.R. § 404.1527(d)(1) (explaining that a treating source statement that the claimant is "disabled" or "unable to work" is not a medical opinion but instead an opinion on an issue reserved to the Commissioner).[17] Finally, as the ALJ reasonably noted, Dr. Boffeli never assigned plaintiff any work limitations prior to completing this report. Plaintiff notes that there is no indication Dr. Boffeli was ever asked for his opinions before, but support in/consistency with the record is an important factor under the checklist. The ALJ could reasonably rely on the fact that Dr. Boffeli's treatment notes failed to support the severe restrictions set forth in his report. For all of these reasons, I reject plaintiff's second claim of error.

## C.    The Listings

In order to meet a Listing, the claimant must present evidence showing that she satisfies each of its "criteria." <u>See</u> <u>Maggard v. Apfel</u>, 167 F.3d 376, 379-80 (7th Cir. 1999). For example, the mental impairment Listings contain "paragraph A" criteria (a set of medical findings that substantiate the presence of a particular mental disorder) and "paragraph B" criteria (a set of impairment-related functional limitations). <u>See</u> <u>Windus v. Barnhart</u>, 345 F. Supp. 2d 928, 931 (E.D. Wis. 2004). The B criteria have four components: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3); <u>Craft</u>, 539 F.3d at 674. A claimant meets the Listing if she establishes at least two of the following: "marked" restriction in daily activities;

---

[17]Plaintiff argues in her reply brief that the ALJ should have re-contacted Dr. Boffeli to determine the basis of the opinion. However, an ALJ need re-contact medical sources only when the evidence in the record is inadequate to determine whether the claimant is disabled. <u>See, e.g.</u>, <u>Skarbek v. Barnhart</u>, 390 F.3d 500, 504 (7th Cir. 2004). Here, the evidence was adequate for the ALJ to find plaintiff not disabled, and the ALJ acted within his discretion in deciding not to re-contact Dr. Boffeli.

"marked" difficulties in maintaining social functioning; "marked" difficulties in maintaining concentration, persistence, or pace; and "repeated" episodes of decompensation, each of extended duration. <u>See, e.g.</u>, <u>Larson v. Astrue</u>, 615 F.3d 744, 748 (7th Cir. 2010).[18] In considering whether a claimant's condition meets or equals a listed impairment, the ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing. <u>Barnett v. Barnhart</u>, 381 F.3d 664, 668 (7th Cir. 2004). Failure to mention specific listings, if combined with a perfunctory analysis, may require a remand. <u>Ribaudo v. Barnhart</u>, 458 F.3d 580, 583 (7th Cir. 2006).

In the present case, the ALJ found that:

> the record does not document any abnormalities severe enough to meet the requirements of any section of the listings, even when considering the additional and cumulative effects of obesity.

> I find that the claimant's schizoaffective disorder does not meet or medically equal the criteria of listings 12.03 or 12.04 for schizophrenic, paranoid, or other psychotic disorders and affective disorders, respectively. Although the evidence shows that the claimant experienced symptoms which are among the criteria necessary to satisfy the requirements of section 12.03A and 12.04A of the Listing of Impairments, the record does not document that the claimant satisfied the requirements of the "paragraph B" criteria for these listings. . . .

> I find that the claimant has a mild restriction in her activities of daily living. While her psychological impairments may prevent her performing some activities, she is able to prepare meals, do housework, wash dishes, do laundry, use the computer, drive, go shopping, do light gardening, and care for her personal needs.

> Next, I find that the claimant has moderate difficulties in social functioning. Although it was reported that the claimant has significant problems in this area, treatment notes indicate no such problems. Although she reported that she does not socialize as much as she used to, she also reported that she has no problems getting along with family, friends, neighbors, or others, and that she

---

[18]The ALJ rates degree of limitation using a five-point scale: none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4); <u>Craft</u>, 539 F.3d at 674-75.

gets along with authority figures "very good".

With regard to concentration, persistence or pace, I find that the claimant has moderate difficulties in this area, as she has displayed some difficulties with concentration, attention, and memory.

The claimant experienced no episodes of decompensation.

Because the claimant's mental impairment did not cause at least two "marked" limitations or one "marked" and "repeated" episodes of decompensation, the "paragraph B" criteria are not satisfied. . . .

Although I find the claimant's schizoaffective disorder to be a severe impairment, I give some weight to the conclusions of the state agency medical consultants . . . and adopt their reasoning in finding that the claimant's schizoaffective disorder only minimally affects her ability to work.

(Tr. at 11-12, internal record citations omitted.)

The ALJ thus mentioned specific Listings, discussed their criteria, and provided more than a perfunctory analysis. Plaintiff nevertheless argues that the ALJ failed to discuss "medical equivalence" and the impact of her physical impairments, including back pain and obesity. But plaintiff fails to explain how her impairment(s), alone or in combination, medically equal a Listing or even to identify any particular Listing she might equal. Therefore, the ALJ's failure to say more on medical equivalence was, at most, harmless error. See, e.g., Ramos v. Astrue, 674 F. Supp. 2d 1076, 1092 (E.D. Wis. 2009) (rejecting a similar argument); see also Sims v. Barnhart, 309 F.3d 424, 431 (7th Cir. 2002) ("Moreover, none of the evidence that Sims contends the ALJ ignored or misstated establishes that her impairments met or equaled in severity the criteria under listings 12.02, 12.04, and 12.06.").

Plaintiff argues that the ALJ failed to properly consider the impact of her obesity. While the SSA has deleted obesity as a separate Listing, obesity can still constitute a severe impairment, "equal" (or in combination with other impairments "meet") a Listing, and diminish

the claimant's RFC.  <u>Masch v. Barnhart</u>, 406 F. Supp. 2d 1038, 1048-49 (E.D. Wis. 2005) (citing <u>Skarbek</u>, 390 F.3d at 504).  The ALJ must also consider the impact of obesity in evaluating pain or other alleged symptoms and limitations.  <u>See, e.g.</u>, <u>Villano v. Astrue</u>, 556 F.3d 558, 562 (7th Cir. 2009); SSR 02-1p.  The ALJ met those requirements here, considering obesity at step two (Tr. at 11, finding obesity a severe impairment), step three (Tr. at 12, considering the "the additional and cumulative effects of obesity"), and step four (Tr. at 14-15, considering plaintiff's history of obesity, with a weight of 310 pounds in July 2008 and 317 pounds in October 2009, in setting RFC).

Turning to the B criteria of the mental impairment Listings, plaintiff argues that the ALJ overlooked her limitations in performing daily activities.  But plaintiff fails to identify any evidence in the record that would support a "marked" limitation in this area, even accepting all of her statements as totally credible.  Further, the ALJ accounted for plaintiff's slower pace in the RFC, restricting her from fast paced production requirements.  Plaintiff also takes issue with the ALJ's "moderate" limitation in social functioning, arguing that the ALJ ignored her testimony about her being fired from her school bus driver job in 2001 following an argument with her supervisor.  It is hard to see how this incident, which pre-dates the alleged onset date by nearly a decade, would support a "marked" limitation.  The ALJ reasonably relied on plaintiff's contemporaneous reports, in which she noted no trouble getting along with others, including authority figures, as well as the treatment notes, which recorded no such problems.  (Tr. at 12.)  Plaintiff also claims that the ALJ overlooked her testimony regarding paranoia in the workplace, but the ALJ considered these issues in limiting her to only occasional interaction with co-workers with no tandem tasks, only occasional "over the shoulder" supervision, and no interaction with the public.  (Tr. at 12-13.)  Plaintiff further faults the ALJ for not better

explaining his finding of "moderate" difficulties in concentration, persistence, and pace. But even if the ALJ should have said more, plaintiff fails to point to any evidence in the record supporting a marked limitation in this area.

Plaintiff also argues that the ALJ found no episodes of decompensation without explaining what he meant by "decompensation." The Seventh Circuit has noted that:

> The listing defines "episodes of decompensation" as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. Pt. 404, Subpart P., App. 1, § 12.00; see also Stedman's Medical Dictionary, 497 (28th ed. 2006) (defining decompensation as the "appearance or exacerbation of a mental disorder due to failure of defense mechanisms"); Zabala v. Astrue, 595 F.3d 402, 405 (2d Cir. 2010) (stating that decompensation is a temporary increase in symptoms); Kohler v. Astrue, 546 F.3d 260, 266 n.5 (2d Cir. 2008) (same). An incident – such as hospitalization or placement in a halfway house – that signals the need for a more structured psychological support system would qualify as an episode of decompensation, 20 C.F.R. Pt. 404, Subpart P., App. 1, § 12.00, but so would many other scenarios. The listing recognizes that an episode may be inferred from medical records showing a significant alteration in medication, see 20 C.F.R. Pt. 404, Subpart P., App. 1, § 12.00.

Larson, 615 F.3d at 750. There is no indication in the record that plaintiff was ever hospitalized or placed in a halfway house, or that she ever suffered any similar loss of adaptive functioning. She points to her various medication changes, but it appears that those changes generally related to financial issues rather than some significant exacerbation of her symptoms. (See, e.g., Tr. at 237, 304.) Dr. Boffeli's treatment notes recorded no significant exacerbations; instead, as the ALJ noted, plaintiff's mental status exams were consistently unremarkable or unchanged. (See, e.g., Tr. at 304, October 5, 2009 note, finding plaintiff "to be her usual self"; Tr. at 294, February 8, 2010 note, finding plaintiff "her usual self"; Tr. at 293, August 16, 2010 note, plaintiff "her usual self"; Tr. at 292, February 21, 2011 note, plaintiff "appeared to be her

usual self".)

Finally, plaintiff argues that the ALJ referenced no state agency opinions in connection with the step three finding and thus should have obtained testimony from a medical expert on the issue of medical equivalence. However, the ALJ specifically noted the state agency psychological consultants' reports in this section of his decision. (Tr. at 12.) It is true that the ALJ did not mention the state agency physical RFC assessments in the step three portion of his decision, but he later gave those opinions great weight in setting RFC. (Tr. at 16.) Because state agency doctors are experts on determining medical equivalence, an ALJ may properly rely on their opinions, Scheck v. Barnhart, 357 F.3d 697, 700 (7th Cir. 2004), and it would be a "needless formality" to require the ALJ to "repeat substantially similar factual analyses" at multiple steps of the sequential evaluation, Rice, 384 F.3d at 370 n.5. Plaintiff argues that the RFC reports were old, not based on the entire record, and the specialties of the doctors were not noticed by the ALJ. However, the reports were prepared on May 26, 2009, and August 13, 2009, and plaintiff points no evidence the consultants skipped or which was created later that might change the outcome. See SSR 96-6p (explaining that an ALJ may rely on a state agency medical or psychological consultant on the medical equivalence issue, obtaining an updated report when additional medical evidence is received that in the opinion of the ALJ may change the consultant's finding). Both consultants specifically considered the effects of plaintiff's obesity on her ability to work (Tr. at 253, 275), and plaintiff points to no contrary medical evidence.[19] See Prochaska v. Barnhart, 454 F.3d 731, 737 (7th Cir. 2006) (affirming where the

_____

[19]In her reply brief, plaintiff notes that Dr. Boffeli later opined that she met a Listing. However, as discussed earlier, the ALJ reasonably gave that report little weight. Moreover, Dr. Boffeli, a psychiatrist, provided no physical RFC assessment. Plaintiff also notes that the ALJ did not cite Dr. Baumblatt's opinion at step three. However, as indicated in the text, the court

ALJ relied on medical reports that explicitly discussed the claimant's obesity).

**D. RFC**

An RFC assessment determines the most work an individual can perform, despite her impairments, on a regular and continuing basis. SSR 96-8p. In determining RFC, the ALJ must consider all functional limitations and restrictions that stem from medically determinable impairments, including those that are not severe. SSR 96-8p. The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations). SSR 96-8p. The ALJ must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved. SSR 96-8p.

As indicated above, in the present case the ALJ found that plaintiff:

> remains capable of performing sedentary work involving simple, routine and repetitive tasks in a work environment free of fast paced production requirements; involving only simple, work related decisions; with few, if any, work place changes; due to moderately impaired attention and concentration work off task 5% of [the] day in addition to regularly scheduled breaks; with no interaction with the public; only occasional interaction with coworkers with no tandem tasks; and, only occasional "over the shoulder" supervision.

(Tr. at 15-16.) In making this finding, he considered the medical evidence, the medical source reports, and plaintiff's daily activities. Plaintiff argues that the ALJ erred in his evaluation of the evidence, but for the reasons set forth above I cannot agree. For instance, the ALJ considered – and rejected – plaintiff's claim that she would miss more than three days of work per month.

--------------------------

must read an ALJ's opinion as a whole and in common sense manner. Buckhanon ex rel. J.H. v. Astrue, 368 Fed. Appx. 674, 678-79 (7th Cir. 2010). I decline to remand so that the ALJ may "repeat substantially similar factual analyses" at both steps three and four. Rice. 384 F.3d at n.5. Finally, I note that plaintiff in reply again fails to identify any analogous Listing she medically equals.

(Tr. at 15.)

Plaintiff also argues that the ALJ failed to define RFC terms, including "simple, routine and repetitive tasks," "simple work related decisions," and occasional "over the shoulder" supervision with no "tandem tasks." However, she cites no authority supporting the notion that such terms require further definition, and the VE seemed to have no trouble answering the ALJ's hypothetical question including them.[20] Nor did plaintiff's counsel seek clarification or further question the VE on these issues at the hearing. See Begley v. Astrue, No. 3:10-CV-73, 2011 WL 1045844, at *5 (N.D. Ind. Mar. 16, 2011) (collecting cases rejecting challenges to hypotheticals not contested or clarified by the claimant at the hearing).

Finally, plaintiff notes that an ALJ must orient the VE to the totality of the claimant's limitations, including any deficiencies in concentration, persistence, and pace, see, e.g., O'Connor-Spinner v. Astrue, 627 F.3d 614, 619 (7th Cir. 2010), and courts have rejected hypothetical questions purporting to address such deficiencies by limiting the claimant to "simple, routine" tasks, Stewart v. Astrue, 561 F.3d 679, 684-85 (7th Cir. 2009) (collecting cases). As indicated above, however, the ALJ's hypothetical question/RFC in the present case was much more specific, restricting plaintiff from fast paced production requirements; requiring only simple work related decisions; and allowing her to be off task 5% of the day due to impaired attention and concentration. See O'Connor-Spinner, 627 F.3d at 619-20 (noting that the Seventh Circuit had let stand hypotheticals formulated in terms of "repetitive, low-stress"

---

[20]Plaintiff notes that these terms are not defined in the regulations or the Dictionary of Occupational Titles ("DOT"). However, there is nothing wrong with the VE supplementing those sources with her own knowledge of job requirements, so long as there is no unexplained contradiction with the DOT. See Weatherbee, 649 F.3d at 569.

work, or restricting the claimant to "low-stress, low-production work").[21]   I therefore reject

plaintiff's challenge to the ALJ's RFC determination.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **AFFIRMED**, and this case is

**DISMISSED**.  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 13th day of June, 2012.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

---

[21]Plaintiff argues in reply that the ALJ's RFC and hypothetical number two (upon which the ALJ relied) do not match.  In the hypothetical, the ALJ stated that "this person would be off-task five percent of the workday due to impaired attention and concentration."  (Tr. at 65.)  The RFC said that "due to moderately impaired attention and concentration [plaintiff would be] off task 5% of [the] day in addition to regularly scheduled breaks."  (Tr. at 15.)  In other words, the RFC used the word "moderately" while the hypothetical did not.  However, the Seventh Circuit has never insisted on a per se requirement that specific terminology be used in the hypothetical in all cases.  O'Connor-Spinner, 627 F.3d at 619.  Plaintiff cites no authority for the proposition that the ALJ may not alert the VE to problems with concentration and attention via a specific amount of "off-task" time, as he did here, rather than using the more nebulous term "moderate."  Further, as discussed in the text, the ALJ included other specific limitations in the hypothetical and the RFC that addressed plaintiff's problems with concentration, persistence, and pace.  This is not a case where the ALJ limited the claimant to "simple, repetitive work," id. at 620, and left it at that.